IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| 2OVER PUBLISHING, LLC, | ) | |
| | ) | No. 35806-2-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOUCHET VALLEY PUBLISHING, | ) | UNPUBLISHED OPINION |
| LLC, | ) | |
| | ) | |
| Respondent. | ) | |

KORSMO, J. — What does it mean to "publish" a "legal newspaper?" That is a question presented by this appeal. Without resolving that issue, we nonetheless affirm the trial court's determination that a newspaper need not be "published" in the same location where it serves as a legal newspaper under RCW 65.16.020.

PROCEDURAL SETTING

The *Waitsburg Times* was approved in 1941 as a legal newspaper for Walla Walla County. In 2011, the Columbia County Superior Court also approved *The Times*[1] as a

---

[1] The paper changed its name from the *Waitsburg Times* to *The Times* in 1955. Its legal name is Touchet Valley Publishing, LLC, dba *The Times*.

legal newspaper for Columbia County. Six years later appellant 2Over Publishing, LLC, petitioned the Columbia County Superior Court to revoke the 2011 approval of *The Times* as a legal paper for Columbia County, arguing that its place of publication was Waitsburg, a town in Walla Walla County. 2Over publishes a competing paper, the *Dayton Chronicle*.

The *Chronicle* argued that because *The Times* is published in Walla Walla County, it could not function as an official paper for Columbia County. The *Chronicle* based its argument that *The Times* was "published" in Walla Walla County on the fact that *The Times* listed Waitsburg as its office of publication. The *Chronicle*'s office is located in Dayton.

No attorney appeared on behalf of *The Times*, but owner Ken Graham opposed the revocation petition by letter to the court, pointing out that there had been no changes in circumstances since the 2011 application. He also attached to his letter two letters written by the former owner of the *Chronicle* in response to the original 2011 petition by *The Times*. Clerk's Papers (CP) at 13-17. The trial judge denied the revocation request, ruling that chapter 65.16 RCW did not require that a newspaper be published in the city where its application for approval was filed. The *Chronicle* moved for reconsideration, pointing out the absurdities that could exist if an out-of-the-area newspaper was designated as an official newspaper. Mr. Graham again responded by letter to the court. CP at 35. The trial court denied reconsideration, reasoning that publication did not

equate with location of printing; the court concluded that a newspaper can qualify as a legal newspaper even if it is printed outside the county and even pointed out that the Lewiston, Idaho, newspaper had been approved as an official newspaper for Asotin County, Washington. The court considered the wisdom of using an out of county newspaper to be a political question to be determined by county officials.

The *Chronicle* appealed to this court. *The Times* did not appear in this court and did not file a brief. A panel considered this case without hearing oral argument.

ANALYSIS

The appeal presents two issues. The first, a procedural question that is treated summarily, is whether the court erred in allowing *The Times* to "appear" in an informal manner through the publisher. The substantive question of where a legal newspaper is published is quite interesting, but one we ultimately cannot and need not answer.

*Appearance*

In both its original order and the order on reconsideration, the trial court noted that *The Times* "appeared pro se through a representative" and the court considered the documents in its rulings. CP at 18, 36. However, a limited liability corporation (LLC) can only appear in a legal proceeding through an attorney. *See, e.g.*, *Marina Condo. Homeowner's Ass'n v. Stratford at the Marina, LLC*, 161 Wn. App. 249, 263-264, 254 P.3d 827 (2011). According to the records of the Washington State Bar Association, Mr. Ken Graham is not an attorney. He, therefore, could not represent *The Times* in court.

3

We question whether Mr. Graham "appeared" on behalf of *The Times*. By statute, the petition to decertify *The Times* needed to be served on the publisher. RCW 65.16.050. A likely reason for that requirement is to allow the publisher to provide relevant information to the judge before revocation is ordered. Also, Mr. Graham did not file an "appearance" for his newspaper pursuant to CR 4(a)(3), although his letters stated factual and legal reasons for rejecting the motion to revoke his newspaper's certification and acted as responsive legal memoranda. Unlike the "appearance" in *Marina Condo.*, where a non-attorney filed a motion on behalf of an LLC, it is less certain whether these letters constituted improper representation by a non-attorney as opposed to constituting a response by a person entitled to statutory notice. *Cf. Marina Condo.*, 161 Wn. App. at 263.

However, we are certain that the remedy was for the *Chronicle* to move to strike the documents filed by *The Times* if they deemed them to be unauthorized pleadings.[2] *Id*. That was not done. Accordingly, they cannot complain that the trial court considered the documents. To the extent that the trial court erred in considering the documents, the error was waived.

---

[2] In light of the practices of the parties in 2011, we understand why that course of action likely was not undertaken.

*Publication*

The question of how a legal newspaper is "published" is an interesting one that likely will need to be addressed by our legislature. Nineteenth century concepts of publication differ dramatically from the publishing realities of the twenty-first century. It is unwise for a court to venture far into this complicated area. What we are prepared to say is that the trial court did not err in its ruling.

Primarily at issue are the requirements of RCW 65.16.020, defining the qualifications of a legal newspaper. It provides in relevant part:

> The qualifications of a legal newspaper are that such newspaper [1] shall have been published regularly, at least once a week, in the English language, as a newspaper of general circulation, in the city or town where the same is published at the time of application for approval, for at least six months prior to the date of such application; [2] shall be *compiled* either in whole or in part in an office maintained at the place of publication; [3] shall contain news of general interest as contrasted with news of interest primarily to an organization, group or class; shall have a policy to print all statutorily required legal notices; and [4] shall hold a periodical class mailing permit.

(Emphasis added.) Between 1921[3] and 1961, the word "printed" had stood in place of the italicized word "compiled." *See* LAWS OF 1961, ch. 279, § 1; LAWS OF 1921, ch. 99, § 1. We have placed the numerals in the statute to demark the four elements identified by

---

[3] The modern statute had its genesis in LAWS OF 1917, ch. 61.

the trial court in its original order.[4]  CP at 19.  The trial court concluded that only the first element was at issue before it.  CP at 19.

Also relevant to this action is RCW 65.16.050, the statute that provides for revocation of the approval of a legal newspaper.  It states in part:

> An order of approval of a newspaper shall remain effective from the time of the entry thereof until the approval be terminated by a subsequent order of the court, which may be done whenever it shall be brought to the attention of the court that the newspaper is no longer qualified as a legal newspaper.

(The deleted portion of the statute describes the process of providing notice to the publisher.)

Nothing in this chapter defines the word "published."  Dictionary definitions of the verb "publish" all emphasize the idea of making information public.  Some of those definitions include "to declare publicly," "disseminate," and to make "public evaluation." Webster's Third New International Dictionary 1837 (1993).  For purposes of its initial ruling, the trial court accepted 2Over's argument that a newspaper's "office of publication" for purposes of mailing is the same location as where the newspaper was "published."  The trial judge pointed out that there was no requirement that a legal newspaper be published in the place where approval as a legal newspaper was pending.

---

[4] Were we breaking this statute down ourselves, we might make the two components of element three separate requirements.

It merely had to be in operation for six months at its place of publication prior to seeking approval to become a legal newspaper. CP at 19-20.

We agree. The first element of RCW 65.16.020, noted previously, requires proof that (a) the paper was *published* in English, at least weekly, as a paper of general circulation in the town where it is published, for at least six months prior to seeking approval as a legal newspaper; (b) it is *compiled* in part at the publication office; (c) *contains* news of general interest and has a *policy* to print all required legal notices; and (d) holds a periodical class *mailing permit*.

Nothing in this statute requires a legal newspaper to be published, whatever meaning that term may have, in the same locale where it serves as a legal newspaper. RCW 65.16.020 simply requires that the newspaper be *established* before it seeks to become a legal newspaper.[5] It has to be published in English as a general circulation newspaper in the town where it maintains a publication office for at least six months prior to making application. It also has to at least partially compile the paper in that location, maintain a policy of printing all legal notices, and have a periodical mailing permit. None of these activities need be accomplished in the county where the publication seeks legal newspaper status.

---

[5] The 1917 session laws took the same view when the statute was adopted; the sole column note stated: "Six months' prior existence necessary." *See* LAWS OF 1917, ch. 61.

Accordingly, we agree with the trial court's initial order. *The Times* met the requirements for being recognized as a legal newspaper when it sought that status in Columbia County in 2011.

On reconsideration, the trial court also rejected the argument that publication needed to be equated with printing. Not only does nothing in the current language of the statute require printing at the place of publication, history establishes that the legislature has always considered "printing" to be different than "publication." The original 1917 statute made no mention of printing. However, the 1921 revisions to the statute expressly required that the newspaper "shall be printed either in whole or in part in an office maintained at the place of publication." LAWS OF 1921, ch. 99, § 1. This language showed that the legislature distinguished printing from publishing. The legislature maintained that policy for 40 years before deleting the printing requirement in favor of "compiling" the newspaper at the place of publication. LAWS OF 1961, ch. 279, § 1.

The history of the statute confirms that the legislature did not equate publishing a newspaper with printing the newspaper.[6] The trial court did not err in denying reconsideration.

---

[6] The same distinction was made in the early version of our service by publication statute: "The publication shall be made in a newspaper printed and published in the county where the action is brought." LAWS OF 1895, ch. 86, § 2.

No. 35806-2-III
*2Over Publ'g, LLC v. Touchet Valley Publ'g, LLC*

The judgment of the trial court is affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Fearing, J.

_____
Pennell, A.C.J.

9